### Dawn M. Auger v. Michael M. Auger

[546 A.2d 1373]

No. 86-334

Present: **Allen, C.J., Peck, Gibson, Dooley and Mahady, JJ.**

Opinion Filed April 29, 1988

*Gensburg & Axelrod*, St. Johnsbury, for Plaintiff-Appellee.

*M. Jerome Diamond* and *Suzanne R. Brown*, Law Clerk (On the Brief), of *Diamond & Associates, P.C.*, Montpelier, for Defendant-Appellant.

**Mahady, J.** Defendant-husband brought this appeal from a final order of divorce. At trial the principal issue involved the custody of the minor child of the parties. The issue on appeal is whether the conduct of the final hearing deprived the defendant of a fair trial. We conclude that it did and reverse.

Prior to taking evidence, the trial court advised counsel that it wished to depart from the customary order of proof. As a result, the first witness was plaintiff followed by the child's day care teacher (who testified favorably for the defendant) and defendant.

By the noon recess, the first two witnesses had testified, and defendant was in the process of testifying. During the recess, the trial judge advised both counsel in chambers that he was inclined to plaintiff's position in the litigation and that plaintiff might not need to present further testimony.

During the testimony of the day care teacher, the court appears to have cut off her direct examination by defendant's counsel prior to completion of that examination, commenting, "All right; why don't we let [plaintiff's counsel] question the witness?" The direct examination had not been lengthy nor had it been cumulative.

Throughout the hearing, the court questioned the witnesses extensively. Such interrogations were interspersed throughout the direct and cross-examination of counsel. In all, the court asked approximately 156 questions of the various witnesses; interrogation by the court appears on 63 pages of the total 143 pages of the transcript.

Following the noon recess at which the court expressed its "inclination," the defendant presented three additional witnesses and recalled the day care teacher. The court questioned these witnesses extensively. Most of the interrogation was in the form of cross-examination with a liberal use of leading questions.

At the close of the evidence, the court took a recess for a total of twenty-two minutes. It thereupon announced its decision from the bench awarding custody of the minor child to plaintiff.

Defendant filed a motion for a new trial, which the court denied in a written opinion. In that opinion the court noted:

> The most frequently discussed reason for judicial reticence regarding the questioning of witnesses is the appearance of neutrality. But what is the importance of that consideration outside the scope of jury trials? While one may conceive of a class of cases in which the appearance of neutrality is more important than the adduction of relevant testimony, surely bench trials of custody cases do not fall into such a class.

It is, of course, true that a trial judge may "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." V.R.E. 611(a). The court may also "interrogate witnesses, whether called by itself or by a party." V.R.E. 614(b). This has long been our accepted practice. See, e.g., *State v. Noakes*, 70 Vt. 247, 257, 40 A. 249, 252 (1897).

It is also true, however, that "every person is entitled by law not only to a fair trial of his case, but to one free as may be from suspicion of partiality." *Ricci* v. *Bove's Administrator*, 116 Vt. 406, 411, 78 A.2d 13, 18 (1951). This basic principle applies to all trials whether they be tried to a jury or to the bench. Indeed, the Advisory Committee note to the identical Federal Rule, F.R.E. 614(b), warns that the trial judge's "authority is, of course, abused when the judge abandons his proper role and assumes that of advocate, but the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule. The omission in no sense precludes courts of review from continuing to reverse for abuse."

Consistent with this principle, a trial judge may control the presentation of evidence and may interrogate witnesses, but "he nonetheless must remain the judge, impartial, judicious, and, above all, responsible for a courtroom atmosphere" which provides a trial free as may be from suspicion of partiality. *United States* v. *Brandt*, 196 F.2d 653, 655 (2d Cir. 1952).

"Under the Anglo-American adversary trial system, the parties and their counsel have the primary responsibility for finding, selecting, and presenting the evidence." McCormick on Evidence § 8, at 14-15 (3d ed. 1984). While judicial intervention is often appropriate, it must always be kept in mind that "the judge who actively interrogates a witness is interfering with the opportunity of the adversaries to make their cases as strong as possible and

with their opportunity to give the trier of fact, whether judge or jury, the chance to see the full strength of each competing position." Saltzburg, *The Unnecessarily Expanding Role of the American Trial Judge*, 64 Va. L. Rev. 1, 55 (1978).

The observation of former Chief Justice Wilson of the Supreme Court of Minnesota in a divorce case applies to this case: "Many of the things to which [the trial judge] directed questions would have been developed by counsel had the court's patience permitted." *Taylor* v. *Taylor*, 177 Minn. 428, 432, 225 N.W. 287, 289 (1929).

It is the better practice to allow counsel the opportunity to develop the facts in the first instance. Counsel is in a better position to do so. As Judge Frankel has noted:

> The judge views the case from a peak of Olympian ignorance. His intrusions will in too many cases result from partial or skewed insights. He may expose the secrets one side chooses to keep while never becoming aware of the other's. He runs a good chance of pursuing inspirations that better informed counsel have considered, explored, and abandoned after fuller study. He risks at a minimum the supplying of more confusion than guidance by his sporadic intrusions.

Frankel, *The Search for Truth: An Umpireal View*, 123 U. Pa. L. Rev. 1031, 1042 (1975). While judges may be tempted to succumb to the conceit that their participation is essential to the truth-seeking process, "judicial interrogation to search for the whole truth or to complete the evidence presupposes that the judge knows the truth better than the parties or their counsel. . . . There is something unseemly about a judge . . . who seeks to elicit testimony in aid of those answers." Saltzburg, 64 Va. L. Rev. at 57-58. In short, "a trial judge is poorly positioned and informed to perceive or rescue Truth in the midst of a trial." Uviller, *The Advocate, the Truth, and Judicial Hackles: A Reaction to Judge Frankel's Idea*, 123 U. Pa. L. Rev. 1067, 1069 (1975). He can too frequently become "a blind and blundering intruder, acting in spasms as sudden flashes of seeming light may lead or mislead him at odd times." Frankel, 123 U. Pa. L. Rev. at 1042.

Therefore, "[e]very advocate should be given elbow room in the performance of his duty to his client." *Taylor* v. *Taylor*, 177 Minn. at 432-33, 225 N.W. at 289. "It must be that duties be-

tween court and counsel are reciprocal. The trial court owes a duty to counsel, who is an officer of the court. A reasonable amount of questions from the court may be helpful. If this is to be done extensively it should be after counsel has completed his examination." *Id.* at 434, 225 N.W. at 289-90.

"Active judicial interrogation runs afoul of basic principles underlying the adversary system." Saltzburg, 64 Va. L. Rev. at 55. It can produce an undesirable effect on witnesses who may be much more likely to say what they believe the judge wants to hear than would be the case if counsel asks the questions. This danger is particularly acute when, as here, the judge asks leading questions. *Id.* at 59. Worse, "[t]his form of judicial activism detracts from the judge's appearance of impartiality and may cause the parties to question the fairness of the trial procedures and the judgment of the court." *Id.* at 58.

These concerns apply with full force to trials which are tried to a court, sitting without a jury. In child custody proceedings, it clearly is in the best interests of the child that the parents to the degree possible perceive that they were treated fairly by the court; otherwise, protracted litigation and engendered bitterness all too often follow.

Proper judicial interrogation is, of course, essential to the sound administration of justice. As Learned Hand noted: "A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States* v. *Marzano*, 149 F.2d 923, 925 (2d Cir. 1945). It is not the practice of judicial interrogation which we condemn; indeed, we reiterate our recent holding, that "[t]he trial court enjoys a great deal of discretion in controlling the interrogation of witnesses and the presentation of evidence . . . ." *Coty* v. *Ramsey Associates, Inc.*, 149 Vt. 451, 462, 546 A.2d 196, 204 (1988). It is the manner in which such discretion was exercised in this case with which we must find fault.

Active interrogation in and of itself may not require reversal. See, e.g., *Taylor* v. *Taylor*, 177 Minn. 428, 225 N.W. 287. Here, however, the trial court also took over control of the presentation of the evidence. He prematurely terminated defendant's direct examination of a key witness. At an early stage of the trial, he announced his "inclination" favoring the plaintiff. Following that, he actively examined defendant's witnesses thereby creating the appearance of defending his previous "inclination." A decision in

favor of plaintiff was announced from the bench shortly after the close of the evidence. The defendant's motion for a new trial was denied with an explicit disavowal by the court of the importance of the appearance of impartiality.

Taken together, these factors combined to deny defendant a trial "free as may be from suspicion of partiality." *Ricci* v. *Bove's Administrator*, 116 Vt. at 411, 78 A.2d at 18. A new hearing is required.

*Reversed and remanded.*

**Dooley, J.,** dissenting. I can not agree that the trial court's actions in this case warrant reversal and a new custody hearing. Further, I believe that the majority opinion sends some unfortunate signals to the trial bench that will only limit the search for truth in child custody proceedings. The result of reversal in this case is to punish innocent litigants, and most important the child whose custody is in issue, by putting them through another bitter and emotional custody fight all because the majority has a philosophical disagreement with the trial judge. Accordingly, I must dissent.

I have four major differences with the majority: (1) it exaggerates the facts justifying its reversal and omits those that suggest affirmance; (2) without a showing of prejudice, the result is wrong; (3) the errors involved were waived by the failure to object below; and (4) the legal and philosophical principles behind the majority opinion have been wrongly applied to a custody case.

I will not detail all my differences with the majority on the facts. The majority recognizes that the number of questions by the trial judge alone does not demonstrate that the hearing was unfair and cites six additional factors to justify its conclusion that reversal is necessary. One factor—that the court prematurely terminated defendant's examination of a witness—is not in my opinion supported by the record. Defendant's trial counsel did not make this claim and, therefore, it was not dealt with below. While the transcript is not entirely clear, the fact that defendant's counsel asked only one question on redirect of the witness involved suggests no premature termination of the direct examination.

The majority also asserts that the trial judge cross-examined defendant's witnesses after giving a "weather report," at the noon recess. The questioning of the witnesses can not fairly be called

cross-examination. As a matter of form, few questions would have been objectionable if they had been asked on direct examination in a jury trial. The questions violated every rule for effective cross-examination of a witness. See, e.g., T. Manet, Fundamentals of Trial Techniques 242-47 (1980). For example, one open-ended question to a key witness for the defendant elicited an answer that takes up two transcript pages. In general, the questioning elicited explanations on parts of the testimony that the court found incomplete and helped the defendant as much as it hurt him. The fact that the trial judge participated to an uncommon degree in questioning without more does not warrant a new trial absent a showing of a denial of a fair and impartial hearing. See *Garrett* v. *Desa Industries, Inc.*, 705 F.2d 721, 724 n.1 (4th Cir. 1983).

Finally, the majority relies on a finding that the trial court "took over control of the presentation of the evidence." This is an exaggeration that makes an event that helped the defendant look unfair. At the beginning of the trial, the court, with no objection from the parties, indicated that it wanted to hear the testimony of the plaintiff followed by the testimony of the defendant's most important witness and the defendant. Thereafter, all witnesses were put on in the order chosen by the parties, and no witness was omitted. The purpose of the order was to allow the defendant to state his position early on and to allow the day care worker (the defendant's key witness) to get back to work. I fail to see how this action by the court, expressly authorized by V.R.E. 611 and desirable in a case like this, adds to the necessity for a reversal.

My disagreement over the facts is heightened by what the majority omits. The trial court was put in a difficult situation by overly optimistic estimates by trial counsel of how long the evidence would take. Because the parties had estimated that the hearing would take 3/4ths of a day and another contested custody case was specially assigned for the following day—the last day the judge would be in the county for a number of months—it was important that time limits be maintained. The parties showed up with some 10 witnesses, and it appeared that without active judicial management, the case would not be finished within the time allotted. See *State* v. *Howard*, 405 A.2d 206, 211 (Me. 1979) (time saving legitimate reason for questioning by the court).

The judge was also dealing with relatively inexperienced counsel at least for the defendant. He had been admitted to practice for only two and one-half years. As a result, it was clear that the judge found the examination incomplete, without essential information that allowed him to understand and evaluate the evidence. This was a major cause of the extensive questioning.

When the facts are put in proper perspective they do not contribute to a finding that the hearing was unfair. Reversal is wholly unwarranted on this record.

More important is my second objection—that there is no showing that the alleged improper conduct by the trial judge affected the result in any way. The defendant did not challenge the decision of the trial court on its merits in his motion for a new trial and has made a wholly unconvincing argument here that the evidence required that the defendant be awarded custody. None of the evidence elicited by the trial judge contributed in a significant way in the custody determination. The defendant's trial counsel made a general statement that his "train of thought" was disrupted by the court's questions but pointed to no testimony which was omitted or left undeveloped as a result of the questioning.

A full reading of the record shows that if the trial judge had never asked a single question, had never affected the order of witnesses and had never given a "weather report," the substantive result would have been the same. Thus, a philosophical dispute between the majority and the trial judge as to the proper role of the presiding judge in a custody case has been turned into another threat to the stability of the home environment of a child, accompanied by great expense and emotional pain from another bitter custody hearing. The remedy is inappropriate for the asserted wrong.

Third, the defendant made no objection to any of the actions of the court even though our law clearly requires an objection to preserve these issues for review. See V.R.E. 103(a), 614(c); *Neverett* v. *Towne*, 123 Vt. 45, 49-50, 179 A.2d 583, 586 (1962). This requirement has simply been ignored. See *United States* v. *Vega*, 589 F.2d 1147, 1152 (2d Cir. 1978); *Kerry Coal Co.* v. *United Mine Workers of America*, 488 F. Supp. 1080, 1103-04 (W.D. Pa. 1980); *In re J.A.*, 283 N.W.2d 83, 88 (N.D. 1979); *People* v. *Smith*, 95 Mich. App. 492, 291 N.W.2d 91 (1980).

It is not an answer to the requirement of an objection that such conduct would invite retribution by the trial judge. V.R.E. 614 which authorizes questions by the trial court is identical to Federal Rule of Evidence 614. The federal rule was originally drafted without a requirement for an objection but was changed to require an objection. The change was in response to the position of the Committee of New York Trial Lawyers that " '[j]udges are not so sensitive that counsel should be reluctant to make a proper objection merely because the question came from the bench.' " See 3 Weinstein's Evidence ¶ 614[04], at 614-14 to 614-15 (1987) (quotation omitted). Ironically, plaintiff's counsel did make evidentiary objections and had them overruled. There is no reason that defendant's counsel could not suggest in a nonconfrontive way that the questioning was disrupting his examination of witnesses. His failure to do so should preclude reversal on this issue.

My fourth reason is that the majority has engrafted doctrine developed on the model of federal jury trials to a nonjury custody case. The model is so dissimilar to this case that the policy is directly contrary to what should prevail in a custody case. For example, Judge Frankel, who the majority cites and quotes in support of its position, makes clear that his main concern is the "disproportionate and distorting impact" on the jury. Frankel, *The Search for Truth: An Umpireal View,* 123 U. Pa. L. Rev. 1031, 1042-43 (1975). Professor Uviller, also cited and quoted in the majority opinion, sees a major difference between a jury and bench trial. He stated:

> I think Judge Frankel speaks throughout (as I do) of the judge's role in a jury trial. To me, a bench trial is an altogether different event. To allow counsel to manage the production of proof before a judicial factfinder as though he were a naive, lay, mute jury may be a blind and wasteful devotion to an inappropriate trial format. . . . In bench trials, then, a major role in the interrogation of witnesses should be taken by the judge who should explore the issues of importance to him to the extent he deems necessary for his own illumination.

Uviller, *The Advocate, The Truth, and Judicial Hackles: A Reaction to Judge Frankel's Idea,* 123 U. Pa. L. Rev. 1067, 1069 n.1 (1975). The case law is consistent with this distinction between jury and bench trials. See, e.g., *State* v. *Pickering,* 491 A.2d 560,

564 (Me. 1985) (criminal bench trial); *In re J.A.*, 283 N.W.2d at 86 (juvenile proceeding).

The last kind of proceeding where we should insist on a hands-off judicial attitude is a contested custody matter. A number of courts have labeled such proceedings as nonadversary. See, e.g., *Rayer* v. *Rayer*, 32 Colo. App. 400, 403, 512 P.2d 637, 639 (1973). Our recent statute requires the trial court to "consider" eight statutory factors. See 15 V.S.A. § 665(b). These factors were adopted to ensure that the custody decision is based solely on the best interests of the child. *Id.* In fact, the case presented by the litigant parents is more likely to be about the desires and interests of the parents interspersed with allegations of marital misconduct and fault. The strain on the truth finding process is enormous. For this reason, a leading treatise on custody cases notes:

> However, since custody-visitation cases are uniquely concerned with the rights and best interests of children, judges have enormous leeway in being able to examine any of the witnesses called as to matters already testified to or to develop new areas of testimony. As a matter of fact, the court in a custody-visitation case can of its own volition, raise any issue it deems necessary to resolve the problem of what may be best for the children.

3 J. McCahey, Child Custody & Visitation Law and Practice § 19.03[2], at 19-21 to 19-22 (1988). Increasingly, nonadversary devices like the professional custody evaluation are being used to find the best interest of the child. See, e.g., *id.*, §§ 22.06, 24.03 (court appointed experts). We should applaud the attempts of trial judges to get beyond the narrow and often distorted view of child custody presented by the parents. Inevitably one or both of the parents will find inappropriate the judge's intervention to develop important evidence on the best interest of the child. If appearances alone will determine the propriety of questioning in such instances, very little judicial questioning will be allowed. The unfortunate tribute to the adversary system in this case will chill the pursuit of truth to the detriment of children whose custody we must determine.

I have equivalent concerns about the criticism of the "weather report" given by the trial court at the noon recess in this case. It was done after the most important evidence—the testimony of the plaintiff and day care worker and the direct testimony of the

defendant—and not at an "early stage of the proceedings" as the majority states. I think it is highly desirable for the fact finder to give some reaction to the evidence to help counsel in knowing what other evidence to offer to address issues raised by the fact finder and to encourage settlement. In general, this practice contributes to fairness. Studies show that it is supported by trial lawyers. See Bragel, *Settling Civil Cases: What Lawyers Want from Judges*, 23 Judges J. No. 3 at 14 (Summer, 1984). In this case, it could only help defendant and was not objected to.

I fear that trial judges will cease giving reactions to evidence in response to the majority opinion. This is another reason why I find it ill-advised.

On the whole I think the majority has turned a philosophical disagreement with the trial court into a counterproductive paean for the adversary system that will retard justice and truth finding, not advance it. Meanwhile, the child involved will go through more months and possibly years of insecurity and bitterness.

I would affirm. I am authorized to say that Chief Justice Allen joins in this dissent.